and press; arguing against equitable interference by showing how the party charged could thereby be punished and deprived of his liberty without trial by jury.

The language in Brandreth v. Lance that "the utmost extent to which the court of chancery has ever gone in restraining any publication by injunction has been upon the principle of protecting the rights of property" is law to-day.

In Marlin Firearms Co. v. Shields, 68 App. Div. 91, 74 N. Y. Supp. 84, it was sought to sustain the injunction on the claim that property rights were involved, but it was expressly recognized that "where the injury is purely personal, like an attack upon character and reputation, equity * * * has uniformly declined to entertain jurisdiction." The Court of Appeals, reversing, held that there was no precedent in the courts of this state for equitable interference. I must so hold in this case. The English authorities referred to in the brief are distinguished in Kidd v. Horry, supra (followed in De Wick v. Dobson, supra), where it is shown that they are based on specific acts of Parliament which have no counterpart in the legislative enactments here.

The plaintiff's sole injury, if any, has been to his character and reputation. Though he may have suffered wrong, and the injury be irreparable, equity, as administered in this state, can give him no relief, but he must seek his remedy at law. The motion for a preliminary injunction must be denied, with $10 costs.

Motion denied, with $10 costs.

---

(40 Misc. Rep. 350.)

.JOHNSON v. NEW YORK CENT. & H. R. R. CO.

(Supreme Court, Special Term, Albany County. March, 1903.)

1. CARRIERS—INJURY TO TRESPASSER.
    In an action by one who was not a passenger for damages by being kicked off the platform of a moving car by an employé of defendant railroad company, where the overwhelming evidence is against the plaintiff's version of the affair, a verdict in his favor will be set aside.

Action by Edward Johnson against the New York Central & Hudson River Railroad Company. Verdict for plaintiff. Motion to set aside verdict and for a new trial. Granted.

Motion to set aside verdict for $4,000 rendered in favor of the plaintiff and against the defendant at the March term of the Supreme Court, Albany county.

Joseph A. Murphy (Peter A. Delaney, of counsel), for plaintiff.
William P. Rudd, for defendant.

HERRICK, J. The plaintiff claims that he got upon a train of the defendant, leaving New York City, placing himself upon the front platform of the baggage car, that being the third car back from the engine; that he rode in that place until he reached the city of Rensselaer, opposite Albany, at or about 1:40 o'clock in the morning; that as the train approached the bridge it slowed up, and a trainman,

discovering him on the platform of the car, kicked him off; that he fell with one of his arms under the car, which was so crushed that its amputation was necessary. Upon this trial he identified a trainman on said train named Shultes as the man who kicked him off. . Shultes denies either having seen or kicked the plaintiff. The issue between them is thus sharply presented, and to determine the truth a short analysis of the history of this case and of the evidence given becomes necessary.

The case has been once before tried, and a verdict rendered in favor of the plaintiff, and a judgment entered thereon, which was reversed by the Court of Appeals, and the case sent back for a new trial. 65 N. E. 946.

The accident happened on the night of March 23, 1900. Upon the former trial the plaintiff failed to identify Shultes as the man who kicked him, although Shultes was present in court, and testified as a witness upon the trial. Upon the former trial the plaintiff testified that the man who kicked him off had a sandy moustache and sandy hair. Shultes, as a matter of fact, has dark brown hair, almost black, and by some would be called black, and a dark brown or black moustache, somewhat sprinkled with gray. Upon the plaintiff's attention being called to that fact, he explained that that color was what he called sandy. He states that the reason that he was unable to identify the man on the former trial was because he did not have on his railroad uniform, whereas the man who kicked him off had on the uniform of a trainman. Shortly before the trial now under review he went to the depot of the defendant in Albany, for the purpose of seeing if he could recognize the man who kicked him when he saw him with his uniform on, and when he saw Shultes with his uniform on he says he identified him. When the defendant came to present its side of the case Shultes was produced with a uniform on, such as the plaintiff described as having been worn by the man who kicked him, and personally I could not see that it made any difference in the appearance of the man's face or head that would at all embarrass one in identifying him. This case was reversed in the Court of Appeals, as it appears, because upon the former trial the evidence failed to show that the man who kicked the plaintiff off the car was one of the servants or employés of the defendant.

The plaintiff went to defendant's depot to see if he could identify Shultes as the man who kicked him off, after he had heard of the decision of the Court of Appeals, and upon his cross-examination he was asked and answered the following questions:

"Q. You understood, didn't you, that the court in defeating you in this lawsuit, setting aside your judgment, had said that it was necessary for you to pick out the man, didn't you? A. Sir? Q. You understood that when the court set aside your judgment that you got on the other trial it said that it would be necessary for you to pick out the man that kicked you off, didn't you? A. Yes, sir."

The witness Shultes was sworn upon the former trial, and, in the absence of any claim to the contrary, it must be assumed that he swore then as he does now, and from his testimony it appears that he was stationed on the rear car of the train; that he was the only official

or employé of the company on that car; that the other trainman was in the forward passenger coach in company with the conductor. The plaintiff knew that, and he apparently knew that it was necessary to show that some one on the train, coming from the rear, was the one who kicked him from it. So much for the identification and the reasons for it.

The plaintiff says that the train slowed up as it approached the bridge; that when it slowed up "a brakeman dressed in a uniform suit, with a railroad lantern, went running ahead, run ahead of me, and on his way back, he didn't stay, well, there for a minute, just as quick as he could get back he saw me setting in the doorway, and he jumped on where I was, and he says, 'What are you doing on here, get off here;' so I didn't get up; I didn't have time to get up; he just give me a kick, and I went right over and fell on the track, and this arm went right under the train." He says he was kicked off and fell, on the left side of the track, and furthermore indicated from his position in the witness chair upon which side of the track he fell, which was, as a matter of fact, between the track and the Hudson river.

The night watchman who found him, the conductor and brakeman of a near-by freight train, to whom the night watchman communicated the fact that the plaintiff was there and injured, and who thereupon removed him, all unite in saying that he was on the right-hand or easterly side when found.

It will be observed that he testified that when the train slowed up the brakeman came running up, ran ahead of the car where the plaintiff was, then came back, the train being still in motion. The train appears to have been composed of ten cars—two express cars, one baggage, one smoker, one coach, and five Pullman sleeping cars. Shultes, then, if he was the man who kicked plaintiff off, would have had to pass four cars at least before reaching the one upon which the plaintiff was, pass ahead of that, then shortly afterwards come back, and the train must have been going slow enough to enable him to do this. The locomotive engineer, his fireman, the conductor, the baggageman, and both trainmen, all men in the employ of the railroad for a number of years, testify in relation to the speed of the train at this point, and none of them make it less than 15 miles an hour. Of course, even men who are accustomed to traveling and the movement of trains are liable to err in regard to speed, and there seems to be almost a mathematical demonstration of that fact in this case. There are three towers in the yard of the defendant company in the city of Rensselaer through which its trains pass to reach the bridge crossing the Hudson river. These towers are known as 97, 98, and 99. The towerman of 98 was produced as a witness, and it seems that amongst other things it is his duty to keep a record of passing trains. That record, made at the time this train passed, was produced by him in court, and from his testimony it appears that there is an electrical device by which when a train passes 97 he is notified of that fact and immediately notes it down, when it passes his own tower he notes that fact, and when it passes 99 an electrical device of the same character notifies him of that fact. From the record of the train upon which this accident happened, it appears that the train passed tower 98

at 1:38 o'clock, that it passed tower 99 at 1:39 o'clock; making the time between the two towers one minute.

From the testimony of the civil engineer who was produced it appears that the distance between the towers 98 and 99 is 3,075 feet; in other words, the train passed over a distance of 3,075 feet in a minute, or at the rate of 34 $9/10$ miles an hour.

It is an admitted fact in the case that the plaintiff did not move, or at least did not move for any considerable number of feet, from the spot where he fell, and when he was found he was about midway between towers 98 and 99. If the train was going at that rate of speed, or even at the minimum rate testified to by any of the employés of the defendant, it would have been impossible for a trainman to leave any part of the train and run ahead—that is to say, to make a greater speed than that at which the train was going—then return and get on the car in the manner described by the plaintiff.

All the employés of the defendant upon the train were sworn as witnesses, the engineer and his fireman, the baggageman, the expressman, the conductor and both trainmen, and they all unite in saying that the train did not slow up at the point where the plaintiff was found in the manner or to the extent described by him; that they did not know of his being upon the train, did not see him or hear him, and they did not know of the injury to him until some time after the train had reached the depot in Albany, and some of them had returned to the city of Rensselaer, where they resided, then hearing for the first time that the plaintiff had been injured. They all unite in saying, and each of them says, that he did not get off the train while it was moving through the city of Rensselaer, and the train man Shultes says that he did not get off, as before stated, and did not see or kick the plaintiff; and the testimony of these men, as pointed out by the Court of Appeals in this case in 173 N. Y. 83, 65 N. E. 946, is not to be rejected because they are employés of the defendant.

It is true that the witness Shultes is an interested witness, because he is the one identified as the one having committed this wanton assault upon the plaintiff, and he may be said to be interested to the same extent that the plaintiff is. But the plaintiff stands alone and uncorroborated in his account of the transaction, while Shultes is corroborated by an overwhelming weight of evidence in the case. We are not to determine how the accident happened, but whether it happened in the manner shown by the plaintiff, and upon that this case stands or falls. In this case the overwhelming weight of evidence is opposed to the claim of the plaintiff, and it seems manifest that the verdict rendered could only be the result of passion or prejudice, or a clear misapprehension of the evidence.

The motion to set aside the verdict and for a new trial is granted, but granted, however, upon the payment of the plaintiff's costs and disbursements of the trial by the defendant within 20 days after the entry of this order; otherwise the motion is denied. Ordered accordingly.